RUTH W. DENNIS ET AL., APPELLEES, V. THE OMAHA
NATIONAL BANK, SUCCESSOR TRUSTEE OF THE TRUST
ESTATE OF WILLIAM P. MYERS, DECEASED, ET AL.,
APPELLANTS.

46 N. W. 2d 606

Filed March 2, 1951. No. 32870.

*Brown, Crossman, West, Barton & Quinlan, Wiltse & Wiltse,* and *Joseph C. Reavis,* for appellants.

*Archibald J. Weaver* and *Paul P. Chaney,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs brought this suit in equity, making all necessary parties defendants, to interpret or construe a will, terminate an express testamentary trust concededly created thereby, and obtain an order for distribution of the corpus of the estate to them per stirpes, as allegedly provided in the will or under the law of this jurisdiction governing resulting trusts. Issues were framed thereon by appropriate pleadings, and the case proceeded to trial on December 20, 1949.

On May 8, 1950, at the February 1950 term of court, a decree was entered, substantially finding and adjudging that for failure of purpose and performance or accomplishment, the trust terminated on August 31, 1947, whereupon the successor trustee held all of the corpus of the trust estate for plaintiff's named heirs of the testator as of that date, designated as the surviving children and grandchildren of a deceased brother and sister of testator. It directed the trustee to account for distribution accordingly in the county court of Richardson County, Nebraska, where the trust was being administered.

Timely motions for new trial were filed during the February 1950 term by defendants, Omaha National Bank, successor trustee, hereinafter designated as the bank; John H. Wiltse, administrator of the estate of Miranda S. Myers Bennett, hereinafter designated as the administrator; T. Porter Bennett, the husband of Miranda S. Myers Bennett, hereinafter designated as Bennett; and Joseph C. Reavis, as guardian ad litem for unknown defendants and as attorney for unknown de-

fendants, if any, who were in the armed services. The February 1950 term adjourned sine die May 22, 1950.

Believing that their motions for new trial had been overruled on May 20, 1950, the parties aforesaid each separately and timely filed notices of appeal, not only from the decree of May 8, 1950, but also from the overruling of their motions for new trial.

However, the motions for new trial were not in fact disposed of until June 2, 1950, when an order was entered not only overruling their motions for new trial, but also modifying the decree of May 8, 1950, in such manner as to include only the surviving children of testator's brother and sister, deceased, and to exclude their grandchildren.

On June 6, 1950, plaintiffs or some of them filed a motion to vacate and set aside the order of June 2, 1950, insofar as it purported to modify the decree of May 8, 1950, for want of jurisdiction to do so at a subsequent term. On June 8, 1950, Bennett and the administrator filed a like motion, including an application for rehearing upon their motions for new trial theretofore overruled. Also, on June 8, 1950, the bank timely filed a first supplementary notice of appeal not only from the decree entered May 8, 1950, but also from the order of June 2, 1950, overruling their motion for new trial and modifying the decree of May 8, 1950.

On June 22, 1950, an order was entered vacating and setting aside the order of June 2, 1950, and sustaining all motions for new trial. On the same day, a second trial was had whereat the evidence adduced at the former trial, and some additional evidence not important here, was adduced, whereupon a decree was then entered, identical in all material respects with the decree of May 8, 1950, as modified by the order of June 2, 1950, which eliminated the grandchildren.

Thereupon, the bank filed a supplemental motion for new trial, and plaintiffs, Bennett, the administrator, and guardian ad litem, filed motions for new trial, all of which

were then and there overruled, whereupon the guardian ad litem filed a supplemental notice of appeal from the decree entered June 22, 1950, and the order therein overruling his motion for new trial. Likewise, Bennett and the administrator filed a supplementary notice of appeal from the decree of May 8, 1950, from the order of June 2, 1950, overruling the motions for new trial and modifying the decree of May 8, 1950, from the decree entered June 22, 1950, and the subsequent overruling of their motions for new trial.

On June 2, 1950, a stipulation entered into by all of the parties as of May 26, 1950, was filed in this court, reciting substantially that whereas all the issues to be determined in this court upon appeal from the decree of May 8, 1950, and the overruling of defendants' motions for new trial could be fully and completely determined from a single transcript and single bill of exceptions, then all notices of appeal could be filed as in one cause, and that a single transcript and bill of exceptions filed therein with all further proceedings should be as in a single cause.

During the pendency of the cause in this court, plaintiff Fred M. Myers died in Luzerne County, Pennsylvania, and by stipulation the cause was revived as to him in this court, in the names of The Miners National Bank of Wilkes-Barre, Pennsylvania, and Charles E. Myers, as executors of the last will and testament of Fred M. Myers, deceased.

We are confronted at the outset with two alleged jurisdictional questions. In that connection, this is an equity action for trial de novo, with all parties before us upon the whole record, which contains substantially the same evidence adduced at both trials, about which there is no dispute, and in the light of which there could be but one conclusion. In fact, here the cause was finally argued and submitted upon an agreed statement of facts and issues. In view of the fact that in any event there was a timely appeal perfected in every respect

from the decree of May 8, 1950, and the overruling of defendants' motions for new trial, the contention of plaintiff grandchildren and guardian ad litem for one of them, in their cross-appeal, to the effect that the trial court had no authority or jurisdiction to modify said decree at a subsequent term or set aside its former order overruling defendants' motions for new trial and sustaining the same, is of little importance and becomes purely academic, requiring no further discussion.

On the other hand, the bank contended that the district court and this court on appeal, were without jurisdiction or authority to find and specifically determine, except as a class, who the heirs of the testator were, if it should be decided that the trust was terminated. We conclude otherwise.

As we view it, the very issues in this case formerly before this court in In re Trust Estate of Myers, 151 Neb. 255, 37 N. W. 2d 228, wherein it was decided that the county court had no original jurisdiction of the issues here presented but that the district court did have such jurisdiction, is controlling. Further, Article V, section 16, Constitution of Nebraska, provides: "County courts shall be courts of record, and shall have original jurisdiction in all matters of probate, settlement of estates of deceased persons, and in such proceedings to find and determine heirship * * *." Such provision does not purport to say that such jurisdiction shall be exclusive except in matters of probate and settlement of the estates of deceased persons. The case at bar is neither the one nor the other, but rather one in which the district court had exclusive original jurisdiction of the issues presented. This court has held, and the 1920 Constitution has not changed the rule, that even though no county court decree has ever been entered determining the heirs at law of a deceased person, the district court has original jurisdiction to make such determination where the question becomes material in a proceeding of which such court has original jurisdiction. Lewon v. Heath, 53

Neb. 707, 74 N. W. 274; Jetter v. Lyon, 70 Neb. 429, 97 N. W. 596; Fischer v. Sklenar, 101 Neb. 553, 163 N. W. 861; Gillespie v. Truka, 104 Neb. 115, 175 N. W. 883.

The foregoing rule exists because: "Where a court of equity has obtained jurisdiction of a cause for any purpose it will retain it for all, and will proceed to a final determination of the case, adjudicate all matters in issue, and thus avoid unnecessary litigation." Security Investment Co. v. Golz, 151 Neb. 172, 36 N. W. 2d 862. See, also, Leis v. Beckmark, 133 Neb. 467, 275 N. W. 679; In re Trust Estate of Myers, *supra*. The bank's jurisdictional contention has no merit.

There are concededly remaining then but two questions for determination: (1) Should the testamentary trust be terminated as of August 31, 1947, for failure of purpose, performance, or accomplishment? We conclude that it should. (2) To whom should the entire corpus of the estate be ordered distributed? We conclude that it should be ordered distributed to testator's "next kin in equal degree," determinable as of August 31, 1947, the date of the death of Miranda S. Myers Bennett, hereinafter designated as Miranda, on which date the testamentary trust failed and a resulting trust arose.

The bank and Joseph C. Reavis, guardian ad litem aforesaid, argued that the trust should not be terminated until August 31, 1967, or 20 years after the date of the death of Miranda. All other parties argued that failure of its purpose, performance, and accomplishment, terminated the trust as of August 31, 1947, the date of her death. We sustain the latter contention.

The administrator and Bennett argued that the corpus of the estate should be distributed to testator's heirs at law as of the date of his death, which would include Miranda, her heirs at law, and Bennett her husband as well, or that the trust was destroyed by merger before her death in any event, so that at that time she was sole owner of the property. We conclude that their contentions have no merit.

Plaintiffs and the guardian ad litem for one of them, who were included as grandchildren in the decree of May 8, 1950, but excluded in the decree of June 22, 1950, argued that the first decree was correct, primarily because the corpus of the estate should be distributed to the issue and descendants of the deceased, brother and sister of the testator per stirpes, as allegedly provided in the seventeenth paragraph of the will. We conclude that their contention should not be sustained.

On the other hand, other plaintiffs argued that the estate should be distributed to the children of a deceased brother and sister as testator's next kin in equal degree surviving on August 31, 1947, the date of the termination of the testamentary trust, at which time a resulting trust arose. We sustain that contention.

The facts are simple: William P. Myers died testate, a resident of Richardson County, Nebraska, on January 17, 1905. He was survived by his widow, Helen E. Myers, then 48 years old, and three children, Miranda S. Myers, then 20 years old, Martha W. Myers, then 18 years old, and Lawrence W. Myers, then 15 years old. The widow, Helen E. Myers, survived her husband but a short time, and died intestate during the year 1906, without having been married again or having other children.

Martha W. Myers and Lawrence W. Myers both died intestate without issue or decendants, and without ever having married, Martha having died in 1925, and Lawrence in 1942.

Miranda S. Myers married T. Porter Bennett in the year 1931 and died August 31, 1947, intestate, and without issue or descendants, leaving only her husband surviving.

The will of William P. Myers was admitted to probate in Richardson County on February 18, 1905. It nominated A. J. Weaver as executor and trustee. He was so appointed by the court on October 4, 1906, and continued to act as such trustee until his death October

18, 1945. In the meantime, on December 22, 1927, Miranda S. Myers and Lawrence W. Myers were appointed and qualified to jointly act as trustees along with A. J. Weaver. Lawrence W. Myers subsequently died as above stated, and in 1944 Miranda S. Myers, having in the meantime married T. Porter Bennett, filed her resignation as trustee and asked the court to accept it. Objections were filed, but they are unimportant here, and no final order was entered with respect to the resignation of Miranda S. Myers Bennett until November 27, 1945, at which time her resignation was accepted and the Omaha National Bank was appointed as sole successor trustee of the estate.

In the light of the foregoing facts, decision depends upon an interpretation of testator's will and the application of rules of law well established in this jurisdiction.

Substantially, testator's unusual will provided as in paragraphs hereinafter enumerated:

Paragraph First directed payment of just debts and expenses of administration out of testator's personal estate.

Paragraph Second provided that if such personal estate was insufficient or it was inadvisable to pay such debts and expenses therefrom, then the executor thereafter named was directed and authorized to make temporary loans to pay debts and continue them until enough money was derived to pay the same in full from testator's various properties under management of the executor as provided in the will.

Paragraph Third provided: "I give, bequeath, will and devise unto my executor named in this will, who is to be trustee of my estate, and to his successors, in trust for the use and benefit of my beloved wife, Helen E. Myers, and my beloved children, Miranda S., Martha W. and Lawrence W. Myers, as provided and directed in this will, all the property of which I die seized whether personal, real or mixed."

Paragraph Fourth directed the executor to take im-

mediate possession of all testator's estate upon his death, and directed and authorized the executor to manage and care for the same as in his judgment seemed best for the interest of the estate. It authorized the executor to receive and collect all moneys then due testator from all sources as well as to receive and collect during the period of the trust all revenue accruing from his different properties as well as other revenues and sums which should become due to the estate. The executor was given full authority to sell at public or private sale any articles of personal property of which testator died seized, with certain prescribed exceptions thereto given absolutely to others.

Paragraph Fifth provided and directed that during administration of the estate and continuance of the trust, the executor and trustee should, out of receipts derived from the estate, pay testator's wife $60 a month as long as she lived, and to each of his children $40 a month, and gave authoritative discretion to increase such monthly allowances for suitable maintenance of the wife or the maintenance and education of his children with ultimate equalization thereof to be maintained between his children.

Paragraph Sixth devised use of the family homestead to his wife during her lifetime and gave the executor or trustee, should the wife desire it, direction and authority to purchase or build for her another suitable home within a limited price or cost field, title thereto, however, to be taken in the name of the executor or trustee as representing the estate, in which event her life estate in the old home was to lapse and in lieu thereof a life estate should attach to the new home. He directed and authorized the executor or trustee, when requested by the wife, to sell the homestead then occupied by her, she joining in the deed, and convert funds arising therefrom into interest bearing securities, or purchase then or subsequently a proper and suitable home for her during her life, upon the same terms and conditions as

above provided. The funds arising from the sale of such home and invested at the request of the wife in interest bearing securities, first mortgage loans as provided for the investment of other funds of the estate, were directed to be considered as a separate fund with all income therefrom paid to the wife as it accrued.

Paragraph Seventh gave the executor and trustee power and authority to sell any of testator's real estate at such times and in such manner as in his judgment seemed best, with the exception of certain described real estate in Michigan, and coal leases in Pennsylvania. It directed that all deeds of all lands sold by the executor or trustee as authorized, should reserve to his estate all minerals, oils, gases, and salts, either solid or liquid, lying under the surface of said lands. The executor or trustee was authorized to lease or sell, if he should deem best upon approval of the district court and those of his family then living, any such minerals, oils, gases, and salts, subsequently found under any of said land. The proceeds arising from such lease or sale were directed to be used as other funds held in trust under the instrument. The Pennsylvania coal property, meaning the minerals under the surface, was not to be sold by the executor or trustee, unless the then leases or either of them should have for some unforeseen cause lapsed or become inoperative before all the merchantable coal was exhausted, in which event the questions of releasing or selling said coal was left to the judgment and discretion of the executor or trustee, provided that any releasing or sale thereof should be approved in writing by his wife, if living, and those children named in the will who were living at such time. If none such were then living, then the matter was left with the trustee upon approval of the district court.

Since the Michigan property, in testator's judgment, was suitable in the near future for business property, such as store building sites, etc., the executor or trustee at such time was given authority as in his judgment

seemed proper to improve such property by erecting business buildings thereon for rental purposes, with authority to use for that purpose any moneys accruing to the estate from coal leases, land rentals, or land sales, as well as to convert into money for such improvement any mortgages in his hands belonging to the estate.

All tracts of land owned by him, or in which he had ownership, each comprising several acres adjoining and situated in Edwardsville and Kingston, Pennsylvania, and Falls City, Nebraska, were directed to be sold by the executor or trustee in small tracts or subdivisions in such manner as in his judgment would bring the most money for the estate. In all contracts made by testator during his lifetime, as well as all sales made by the executor or trustee, of any land belonging to the estate and authorized to be sold by the terms of the will, the executor was fully authorized and empowered to make all necessary deeds, same to be binding as if made by the testator himself while living.

Paragraph Eighth directed and authorized the executor and also the trustee, after payment of all debts, expenses of administration, monthly allowances to wife and children, taxes, repairs, and other expenditures authorized by the will, to invest all moneys accruing to the estate from coal leases, rentals, land sales, or other sources, in United States government bonds or first mortgage real estate loans upon farm lands in prescribed areas, made for not more than 50 percent of the value thereof, at not less than 5 percent annual interest, the funds so invested to constitute a fund to remain intact unless withdrawn for improvement of the Michigan property. As such mortgages and bonds belonging to such fund matured and were repaid, they, with resulting interest, were ordered reinvested as theretofore specifically provided, and after the net income from such fund equalled the aggregate monthly allowances to the wife and children, then such fund income should be substituted for such monthly allowances, payable one-third

to the wife, and the other two-thirds to the children, share and share alike.

Paragraph Ninth appointed his nephew, A. J. Weaver, executor, and revoked all former wills. It also constituted said nephew trustee of all of his estate not therein bequeathed absolutely to others, giving such trustee the sole control, management, and disposition of his property as provided in the will, after the ordinary administration of said estate was closed and the executor discharged. In other words, during administration all business was ordered transacted in the name of his representative as executor, and thereafter in the name of his representative as trustee. During administration, the executor was given all of the powers conferred upon the trustee, and thereafter the trustee was given all the powers conferred upon him by the will, and in addition thereto all of the powers given to the executor by the will.

Paragraph Tenth, after providing for the amount of the executor's bond and renewal thereof, recited that after discharge as executor, he should continue in charge of the estate as trustee, and that: "All my said estate, real, personal or mixed shall then vest in him as said trustee for the purposes provided for herein * * *" with like bond as provided for the executor. Itemized reports of the condition of the estate were required at stated intervals, or upon request by any beneficiary.

Paragraph Eleventh provided for the removal of the trustee for cause, and appointment of a successor, but testator expressed himself as "having the utmost confidence in the business ability and integrity of my said nephew, I desire him, if possible to execute the trust herein confided during his lifetime."

The foregoing has been summarized as important to illustrate the all-inclusive estate, power, and authority given the executor and trustee by the testator in his will, as a basis for interpretation and application of

legal principles to the following parts of the will, which provided:

"Fifteenth. If the death of my wife occurs before the termination of this trust, then the share of the income provided for her herein shall go in equal shares to my children then living or the issue or descendants of any such as are dead, by the right of representation.

"If any of my children named herein die without issue before the termination of the trust created herein, their share of income provided for such child shall go in equal shares to my other children then living or the issue or descendants of any such as are dead, by right of representation.

"If any of my children named herein die during the continuance of this trust, leaving issue or descendants, then the share of the income provided for my said child shall go to such issue or descendants.

"Sixteenth. The income from the trust estate provided for herein shall be for the sole use and benefit of my beloved wife and children or the issue and descendants of any of my children that may die during the period of said trust, during their lifetime and shall not be subject to any control or debts of the husband or wife or any of them.

"Seventeenth. The trust herein created shall continue for twenty years after the death of the last surviving member of my family enumerated herein. At the expiration of said time said trust shall cease and be at an end and all of the property then held in trust by the trustee of my estate at that time shall vest absolutely as follows: one third in the issue or descendants of my beloved daughter, Miranda S. Myers, one third in the issue or descendants of my beloved daughter Martha W. Myers, and one third in the issue or descendants of my beloved son Lawrence W. Myers. In case any of my three children should die without issue, then said trust estate, upon the termination of said trust, shall go in equal proportions to the issue or descendants of

such child or children of mine who leave issue or descendants. It is my intention that said trust estate shall remain in the line of my blood and that the issue or descendants of my three children shall take said estate per stirpes. If, at the time of the termination of said trust, any of the three branches of my family as represented by my three children, should have become extinct, then the branches of my family represented by issue or descendants shall take the said estate in equal proportions. If only one branch at such time is represented by issue or descendants then living, such branch shall take the whole of said estate. The rule fixed herein that said property shall descend per stirpes shall extend to and include the descendants of any branch."

In that connection it will be observed that the will contained no ambiguity. In such a situation, the law is that the court in construing a will must first ascertain the intent and purpose of the testator as disclosed by the language of the will and then give effect thereto if not contrary to law. Prudential Ins. Co. v. Nuernberger, 135 Neb. 743, 284 N. W. 266; In re Estate of Hunter, 132 Neb. 454, 272 N. W. 318; In re Estate of Mooney, 131 Neb. 52, 267 N. W. 196.

As stated in In re Estate of Robinson, 139 Neb. 707, 298 N. W. 559: "Where the language of a will is clear and unambiguous, the intention of the testator must be determined from the language thereof and extrinsic evidence is not admissible." In other words, where provisions in a will are couched in correct grammatical language, they will be given the ordinary and natural meaning which that language imports, unless it clearly appears from the whole instrument that a different meaning was intended. Lincoln Nat. Bank & Trust Co. v. Grainger, 129 Neb. 451, 262 N. W. 11; In re Estate of Schuette, 138 Neb. 568, 293 N. W. 421.

Also, it is the rule that where particular words in a will are followed by general, the general words are

ordinarily restricted in meaning to provisions of like kind. Pyne v. Payne, 152 Neb. 242, 40 N. W. 2d 682. In other words, in the interpretation of language used in a will, where a word or words are used in a definite and clearly stated sense, and again used in the same paragraph, it is presumed to be meant in the same sense unless there is a clear indication to the contrary. 57 Am. Jur., Wills, § 1152, p. 750; 69 C. J., Wills, § 1142, p. 84, § 1131, p. 77.

It is equally as well established that where the purposes of a trust fail or become illegal or impossible of performance or accomplishment, the trust will be terminated. Restatement, Trusts, § 335, p. 1016; In re Estate of Mooney, *supra.*

As stated in 65 C. J., Trusts, § 124, p. 351: "Regardless of the nominal duration of the trust it will not continue in equity any longer than the thing sought to be secured by the trust demands. Consequently the trust will terminate as soon as it has been fully performed or executed, or where the object of the trust fails or its execution becomes impossible."

It is also true that a knowledge of such rules as well as other rules of applicable law must be imputed to the testator in the making of his will creating a trust and disposing of his estate. Hill v. Hill, 90 Neb. 43, 132 N. W. 738, 38 L. R. A. N. S. 198.

The purpose of the trust here involved was to provide a monthly allowance for testator's wife and his three children while living, or the issue or descendants of any such children whose death occurred before termination of the trust, which income should not be subject to any control or debts of the husband or wife or any of them, and to create and preserve the entire corpus of the estate for distribution to a class, the surviving issue or descendants of his children, 20 years after the death of the last surviving member of his family, that is, his children enumerated in the will.

On August 31, 1947, when Miranda died, there was

not then and could never be any issue or descendants of his children or any of them. There was thus within the plain purview of the will no person left surviving after the death of Miranda to whom the provisions for income or distribution had or could have any application. It follows that the trust became impossible of performance or accomplishment and terminated as of August 31, 1947. We therefore conclude that the trial court properly disposed of that issue.

It will be noted that testator, in establishing the trust, gave, bequeathed, willed, and devised all of his estate and the income therefrom as well to the trustee, which, under the estate power and authority granted and directed by the will, of necessity vested in the trustee the whole estate or full title in fee simple, including the title of the then uncertain and unascertained remaindermen, until they were ascertained at termination of the trust. 65 C. J., Trusts, § 289, p. 542; Cushman v. Coleman, 92 Ga. 772, 19 S. E. 46; Clark v. Baker, 186 Ga. 65, 196 S. E. 750; Smith v. Rizzuto, 133 Neb. 655, 276 N. W. 406; Restatement, Trusts, § 88, p. 251.

Under the plain purview and intent of the will, none of testator's three children ever had or could have had any vested legal estate in the corpus, or was capable of ever taking any part of the body of the corpus, but each had only the equitable right to require payment of a provided allowance out of the income therefrom. Miranda, the last survivor entitled to such income, received the same for 42 years under the will, which never gave or intended to give her any other interest during her lifetime or thereafter. At her death, all interest that she ever had or could have was extinguished. In re Trust Estate of Myers, *supra;* Weller v. Noffsinger, 57 Neb. 455, 77 N. W. 1075; Hulse v. Tanner, 142 Neb. 406, 6 N. W. 2d 618. Her husband, T. Porter Bennett, was specifically excluded from any interest even in the income, much less any interest in the corpus of the estate.

To hold otherwise would give the will no force and

effect and vest a legal estate in Miranda, which the testator never intended should be done. As a matter of fact, the will provided that Bennett, her husband, should never have any estate, either legal or equitable. We conclude also that the testamentary trust was not destroyed by merger before Miranda's death, although she was for a short time a joint trustee with her brother and the original trustee. The rule is that in order to bring about destruction of a trust through a merger, it is necessary that the entire equitable title be united with the entire legal title in the same person.

As stated in 65 C. J., Trusts, § 325, p. 567: "As a general rule, where the legal and equitable estates in trust property unite in the same person, there is a merger of such estates and the trust is terminated. But a merger does not take place until the legal and equitable titles vest in the same person, and even then equity will often refuse to recognize a merger which might well exist in law, as where such result would be contrary to the intention of the trustor and would destroy a valid trust."

The intention of paragraph Seventeenth was not to ever vest any legal estate in testator's children but after their death and at termination of the trust to vest the corpus absolutely in the issue or descendants of the testator's three children per stirpes. In case any of his three children should die without issue, then it was to vest in equal proportions in the issue or descendants of such child or children of his who left issue or descendants, that is, remain in the line of his blood by vesting in such issue or descendants, meaning their children or grandchildren, ad infinitum, per stirpes. The effect of the remaining sentences was simply to amplify and reaffirm that intention by providing in effect that if at termination of the trust any of his three children should die without issue or with issue or descendants who were dead, that is, did not survive at that time, so that any branch of his family was thus extinct, then in such

situation also the issue or descendants of any branch or branches of his children who were not extinct but did survive at that time should respectively take the corpus in equal proportions, or the whole thereof. In other words, when testator spoke of "any of the three branches of my family as represented by my three children" he defined what he meant by the word "branch" or "branches" and thereafter in succeeding sentences of the same paragraph, in using the word "branch" or "branches" he intended to mean the direct branches thereof, that is, the surviving issue or descendants of his three children or any of them who would survive, rather than collateral branches who were not mentioned in the will. To omit the words "any of" immediately preceding the words "the three branches of my family as represented by my three children" or make them read "all" would void the stated general intention of the testator and rewrite his will, which under the plain language used, we have no authority to do.

At termination of the trust under a will or by operation of law, the beneficiaries ordinarily take the property as provided in the will. However, as here, where complete disposition of the estate was made by the will which by language and necessity vested the whole of the fee in the trustee, defeasible only at termination of the trust, when it was to vest in a class, none of whom then or ever will exist, and the trust is terminated by operation of law for failure of purpose or accomplishment, then the trustee holds the trust estate upon a resulting trust implied by intention for the heirs of the testator who are such as of the date of the failure of the trust. To hold otherwise would give the will and the law of this jurisdiction, which testator was presumed to know when he executed the will, no force or effect whatever.

This court so held under comparable circumstances in In re Estate of Mooney, *supra*, which specifically distinguished the cases generally relied upon by the admin-

istrator and Bennett. There are cases from other jurisdictions seeming to hold otherwise, but they are generally distinguishable upon the particular facts and provisions of the wills involved, or the law of the particular jurisdiction. In re Estate of Mooney, *supra*, has been a rule of property in this state for many years, and we find no good reason for changing it at this time under such similar circumstances as appear in the case at bar. It is controlling. See, also, Blount v. Walker, 31 S. C. 13, 9 S. E. 804; Polsky v. Continental Nat. Bank (a Nebraska case), 110 F. 2d 50; Annotation, 92 A. L. R. 366.

The question then is, who were the heirs of testator on August 31, 1947, the date of the death of Miranda, the date of the termination of the express testamentary trust and establishment of a resulting trust by operation of law. Concededly, on August 31, 1947, no wife, nor issue, nor father, nor mother, nor sister, nor brother, survived the testator. Section 30-102, R. R. S. 1943, which is controlling, provides in part: "(4) if the deceased shall leave no issue, nor father nor mother, nor sister nor brother, the estate shall descend to his next kin in equal degree, excepting that where there are two or more collateral kindred in equal degree, but claiming through different ancestors, those who claim through the nearest ancestor shall be preferred to those claiming through an ancestor more remote * * *."

Obviously the exception has no application here, since all claiming as heirs of the testator on the date of the failure of the trust, claimed through the same ancestors, and are not collateral kindred in equal degree. Testator's surviving "next kin in equal degree" who take the corpus of the estate, are Ruth W. Dennis, Lawrence M. Weaver, Fred M. Myers, since deceased and here represented by the executors of his estate, Harriet E. Macomber, and Jessie Myers Newhart, who each respectively take one-fifth of the corpus. They are kindred in the third degree, and plaintiff grandchildren of a deceased brother and sister of testator, are kindred in the fourth

degree. Section 30-102(3), R. R. S. 1943, can give them no relief, because this court has held that the word "children" appearing therein does not include "grandchildren." Noteware v. Colton, 95 Neb. 541, 145 N. W. 993. The decree of May 8, 1950, erroneously included such grandchildren as entitled to share in the trust estate. Of course, from what has been heretofore stated, neither the administrator nor Bennett is entitled to any part of the estate, and the trial court correctly so held.

For the reasons heretofore stated, we conclude that the decree of May 8, 1950, was erroneous insofar as it permitted plaintiff grandchildren to take any part of the estate. Therefore, such judgment is affirmed in part and reversed in part with directions to enter judgment in conformity with this opinion, which will be generally in the manner attempted in the decree of June 22, 1950.

Costs in this court, and in the district court as well, are taxed to the successor trustee, to be paid by it out of the estate, which, as estimated by the trustee at time of trial had a fair conservative gross value of $175,000. Included in such costs are the guardian ad litem fees heretofore allowed by the district court, to wit: Archibald J. Weaver, $150, and Joseph C. Reavis, $650, together with an allowance therefor in this court to Archibald J. Weaver, $1,500, and Joseph C. Reavis, $1,000.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.